DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

CARLOS SALDANA,

                Plaintiff,

-v.-

DELTA AIRLINES, INC., and DAL GLOBAL SERVICES, LLC,

                Defendants.

1:19 Civ. 027 (CAK)

**MEMORANDUM OPINION**

CHERYL ANN KRAUSE, Circuit Judge, sitting by designation.

    Plaintiff Carlos Saldana brings this action against Defendants Delta Airlines, Inc. ("Delta") and DAL Global Services, LLC ("DGS"), seeking to recover for injuries suffered as a result of Defendants' purported negligence in failing to provide Saldana with a wheelchair. According to Saldana, when no wheelchair was provided after he disembarked the first leg of his flight, a Delta flight attendant told him that he could still make his connecting flight if he walked quickly to the connecting gate. He did so and claims to have suffered a heart attack as a result. Defendants now move for summary judgment and to exclude the testimony of Plaintiff's medical expert. For the reasons discussed below, Defendants' motion for summary judgment will be granted in part and denied in part, and Defendants' motion *in limine* to exclude Plaintiff's expert's testimony will be denied.

1

# BACKGROUND[1]

## A.  Factual Background

Saldana, a citizen of St. Croix, U.S. Virgin Islands, is approximately 70 years old and has a history of cardiac problems.  (Def. 56.1 ¶ 2; *see also* FAC ¶¶ 2, 8).  Delta is a Delaware corporation with its principal place of business in Atlanta, Georgia.  (*See* FAC ¶ 3).  Delta contracts with DGS, a Delaware limited liability company with its principal place of business in Atlanta, to provide wheelchair services to Delta's passengers at the Atlanta airport.  (Haley Dep. 8:25-9:22; *see also* FAC ¶ 4).

On March 7, 2019, Saldana and his wife traveled on Delta Airlines from their home in St. Croix to Washington, D.C., with a connecting flight in Atlanta.  (Pl. 56.1 ¶ 1).  The purpose of the trip was for Saldana to meet with a cardiologist in Washington

---

[1] The facts recounted here are drawn from Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1" (Dkt #72)); Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1" (Dkt. #83)); and the exhibits attached thereto.  Additional facts are also drawn from the deposition testimony of Carlos Saldana ("Pl. Dep." (Dkt. #91, Ex. 1)); the deposition testimony of Maria Saldana ("M. Saldana Dep." (Dkt. #91, Ex. 2)); the deposition testimony of David Haley as representative of DGS pursuant to Fed. R. Civ. P. 30(b)(6) ("Haley Dep." (Dkt. #91, Ex. 3)); the deposition testimony of Katherine Howard as representative of Delta pursuant to Fed. R. Civ. P. 30(b)(6) ("Howard Dep." (Dkt. #91, Ex. 4)); and the deposition of Dr. Neal Shadoff, Plaintiff's proffered medical expert ("Shadoff Dep." (Dkt. #91, Ex. 5)).

For ease of reference, the Court will refer to Defendants' brief in support of their motion for summary judgment as "Def. Br." (Dkt. #71); Plaintiff's brief in opposition as "Pl. Opp." (Dkt. #81); and Defendants' reply brief as "Def. Reply" (Dkt. #85).  As concerning the *Daubert* briefing, it will refer to Defendants' brief in support of their motion *in limine* to exclude the testimony of Dr. Shadoff as "MIL Br." (Dkt. #80); Plaintiff's opposition as "MIL Opp." (Dkt. #84); and Defendants' reply brief as "MIL Reply" (Dkt. #87).  Plaintiff's First Amended Complaint, which is the operative pleading in this litigation, will be referenced as the "Amended Complaint" or "FAC."  (Dkt. #21).

about his difficulty controlling his blood pressure. (Def. 56.1 ¶ 3). In view of that problem and his other cardiac history, including two open-heart surgeries, Saldana requested wheelchair assistance for each leg of his trip. (*See id.* ¶ 2; Pl. Dep. 29:8-29:25, 30:24-31:11).

Saldana's connection in Atlanta to catch his outgoing flight to Washington was extremely tight. If both flights were on time, he would have had only thirty-six minutes to make the connection. (Def. 56.1 ¶ 4). As it turned out, however, the flight from St. Croix to Atlanta was delayed, and Saldana arrived at the gate in Atlanta at 8:41 p.m., approximately thirty minutes later than originally scheduled. (Howard Dep. 20:17-22). By that time, the doors to Plaintiff's connecting flight to Washington had closed, so it was impossible for Plaintiff to make his connection regardless of the speed at which he disembarked and hastened to the connecting gate. (Def. 56.1 ¶ 9; Howard Dep. 20:20-21:6).

Unaware of that circumstance, Saldana and his wife were purportedly told by a Delta flight attendant after disembarking that a wheelchair was not available for Saldana. (Pl. Dep. 30:24-31:17; M. Saldana Dep. 11:5-22). Saldana contends that the flight attendant told him that he could still make his connection if he walked quickly to the gate, which the flight attendant described as around the corner. (Pl. Dep. 30:24-31:17). Defendants dispute that this exchange took place (Def. Br. 2), but the parties do not dispute that there was no wheelchair waiting for Saldana when his flight landed in

Atlanta (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11). The wheelchair did not arrive at the gate until 8:53 p.m. (*Id.*).[2]

According to Saldana, acting on the recommendation of the flight attendant, he and his wife did not wait for the wheelchair to arrive and instead walked to the gate of their connecting flight (Pl. Dep. 30:24-31:17, 32:18-21, 35:1-11; M. Saldana Dep. 11:5-22, 13:9-11), where they were informed that they had missed their connection but had been rebooked on a later flight (M. Saldana Dep. 13:9-25). It was only at this point—at the gate of the original connecting flight—that Saldana allegedly received a wheelchair. (Pl. Dep. 35:19-23).[3]

Saldana claims that he started feeling unwell when he walked from his arrival gate to the gate of his original connecting flight. (Pl. Dep. 35:1-3). By the time he boarded his rebooked flight to Washington later that evening, he was experiencing chest pain. (Def. 56.1 ¶ 10). Shortly after boarding, Saldana was removed from the plane and taken

---

[2] While Saldana's incoming flight arrived at the gate in Atlanta at 8:41 p.m., its estimated time of arrival was 8:46 p.m. (Def. 56.1 ¶ 12). Thus, the wheelchair arrived within ten minutes of the flight's estimated arrival time, and within twelve minutes of the flight's actual arrival time at the gate.

[3] Defendants offer a different narrative. They contend that their records reflect that an agent picked up Saldana at his incoming gate, transported him via wheelchair to the rebooked gate—not the original connecting gate—and left Plaintiff there in the wheelchair to be assisted by another agent at the time of boarding. (Def. 56.1 ¶ 15. *But see id.* ¶ 7 (alleging that Plaintiff "decided, on his own, to try and walk to the departing gate" of his original connecting flight)).

to the hospital, where test results suggested that he may have suffered a mild heart attack. (*Id.*; Shadoff Dep. 51:23-52:22; *see also* MIL Br., Ex. C ("Shadoff Report")).[4]

In addition to negligently failing to have a wheelchair available when he landed in Atlanta, Saldana argues Delta was negligent because its employee improperly told him to hurry to catch his connecting flight. (Pl. Opp. 7). Delta flight attendants are equipped with handheld devices called "Sky Pros" that contain information about the passengers on their flights, including detailed information about connecting flights. (Howard Dep. 21:21-22:7; Def. 56.1 ¶ 14). As such, Saldana argues that the flight attendant who purportedly told him he could still make his connection should have known better, because her Sky Pro should have provided updated information about Saldana's connection. (Pl. Opp. 2-3; *see also* Howard Dep. 21:9-23:9).

In short, Saldana claims both that Defendants were negligent in failing to provide him a wheelchair in a timely manner upon his arrival in Atlanta, and that Delta was negligent for incorrectly telling him he could still make his connecting flight when it knew or should have known the connecting flight had already departed. (FAC ¶¶ 10-11, 14-17; Pl. Opp. 1-2).

**B.  Procedural Background**

Saldana initiated this suit on June 11, 2019, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1331. (Dkt. #1). In his initial complaint, Saldana named

---

[4] In contrast to Saldana's medical expert, Defendants' expert opines that Saldana did not suffer a "myocardial infarction/heart attack" but instead suffered only a "myocardial injury." (MIL Br., Ex D at 5).

5

only Delta as a defendant. (*Id.*). In its answer, Delta argued, among other things, that if Saldana was injured as a result of the events described in the complaint, DGS—not Delta—was liable. (Dkt. #4, ¶ 14). With leave of the Court, Saldana then filed an Amended Complaint (Dkt. #21), which both parties proceeded to answer (Dkt. #26, 28).

Following discovery, Defendants filed their joint motion for summary judgment, which was fully briefed as of December 4, 2020 (Dkt. #70-72, 81-83, 85-86). Defendants' motion *in limine* to exclude the testimony of Plaintiff's proffered medical expert, Dr. Neal Shadoff, was filed on November 20, 2020 (Dkt. #80) and was fully briefed as of December 18, 2020 (Dkt. # 84, 87). The case was reassigned to this Court on September 7, 2021 (Dkt. #89), and both motions are ripe for decision.

## DISCUSSION

**A.     Defendants' Motion for Summary Judgment**

Saldana advances two theories in support of his negligence claim in the instant litigation. *First*, he claims that Delta and DGS were negligent for failing to provide him a wheelchair in a timely manner upon his arrival in Atlanta (the "Delay Claim"). (FAC ¶¶ 14-17). *Second*, he contends that Delta is liable for its employee's negligence in incorrectly telling him he could still make his connecting flight if he went quickly when the employee knew or should have known that the connecting flight had already departed and that Saldana required wheelchair assistance (the "Misinformation Claim"). (FAC ¶¶ 10-11; *see also* Pl. Opp. 1-2).[5] In their motion for summary judgment, Defendants

---

[5] Plaintiff's Amended Complaint advances both theories of negligence under a single count. (*See* FAC ¶¶ 10-11, 13-17). As each theory requires a different analysis,

6

dispute both of Saldana's theories of negligence, arguing that Saldana cannot establish a breach of the standard of care as to the Delay Claim (Def. Br. 1), and that Saldana has offered no non-hearsay evidence to support his Misinformation Claim (Def. Reply 2-3).

For the reasons discussed below, the Court will grant Defendants' motion for summary judgment as to the Delay Claim but will deny the motion as to the Misinformation Claim.

### 1. Applicable Law[6]

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Bonkowski v. Oberg Indus., Inc.*, 787

---

however, they will be addressed separately below as the "Delay Claim" and the "Misinformation Claim."

[6] Both parties agree that Georgia law controls Plaintiff's negligence claim because Plaintiff's injury occurred in Georgia. (Def. Br. 9; Pl. Opp. 6). Virgin Islands's choice of law principles apply to this determination. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). As a sister court in this District recently explained, under such principles, "[a]s a general rule, 'if both conduct and injury occur in a single jurisdiction,' that jurisdiction's law will apply because the jurisdiction has 'an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occur[] there,'" unless "another jurisdiction has a more significant relationship to the occurrence and the parties." *Clarke v. Marriott Int'l, Inc.*, 403 F. Supp. 3d 474, 486 (D.V.I. 2019) (quoting *Buccilli v. Nat'l R.R. Passenger Corp.*, 2010 WL 624113, at *3 (D.N.J. Feb. 17, 2010) (alteration in original)). Here, the injury and conduct at issue occurred in Georgia, and no other jurisdiction has a more significant relationship to the occurrence or parties to overcome that presumption. Accordingly, the Court will apply Georgia law to Saldana's state law negligence claim.

F.3d 190, 195 n.1 (3d Cir. 2015).[7] A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact that supports the elements of its claims. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citing *Celotex*, 477 U.S. at 322-24). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing a genuine issue for trial." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); *see also* Fed. R. Civ. P. 56(c). In reviewing a summary judgment motion, the Court is required to view all facts "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Curto v. A Country Place Condo. Ass'n, Inc.*, 921 F.3d 405, 409 (3d Cir. 2019) (citation omitted). But there are limits: "Unsupported assertions, conclusory allegations, or mere suspicions are

---

[7] The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment (noting that the amendment to "[s]ubdivision (a) . . . chang[es] only one word—genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Third Circuit precedent that refer to "genuine issues of material fact." *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991).

insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

### 2. The Delay Claim

Defendants argue that under Georgia law, the arrival of a wheelchair at 8:53 p.m.—less than ten minutes after the estimated arrival time of 8:46 p.m. and merely twelve minutes after the actual arrival time—cannot constitute a breach as a matter of law. (Def. Br. 9; Def. Reply 3). Because the courts of Georgia agree, *see Glatfelter v. Delta Air Lines, Inc.*, 558 S.E.2d 793, 796 (Ga. Ct. App. 2002), so must this Court.

In *Glatfelter*, an elderly airline passenger who had requested wheelchair assistance at the Atlanta airport suffered injuries on an escalator while attempting to walk to a connecting gate after the defendant failed to provide a wheelchair. 558 S.E.2d at 795-96. The plaintiff in *Glatfelter* arrived in Atlanta too late to make an initial connecting flight, but was told he could make a different connecting flight, scheduled to depart roughly three hours later, in a neighboring concourse. *Id.* at 796. The plaintiff then waited fifteen to twenty minutes for the airline to provide a wheelchair to take him to the new connecting gate, but to no avail. *Id.* At that point, the plaintiff decided to walk instead, and was injured *en route* when he fell on an escalator and broke his ankle. *Id.* Like Saldana, the plaintiff sued the airline for its purported negligence in failing to provide a wheelchair. *Id.*

The Georgia Court of Appeals first considered the source and nature of the duty owed to the *Glatfelter* plaintiff, and attendant standard of care, and concluded they were those imposed by the ACAA. *Id.* at 796 (citing 49 U.S.C. § 40101(a)(1); 14 C.F.R.

9

§ 382.39(a)(1)). The court then considered the extent of the delay in that case and held that "as a matter of law . . . a delay of 15-to-20 minutes [is] not . . . a violation" of the standard of care. *Id.* That holding controls this case and compels summary judgment as to the Delay Claim.

Saldana's arguments to the contrary are unpersuasive. Notwithstanding *Glatfelter*, Saldana asserts that under Third Circuit precedent, the standard of care cannot be dictated by the ACAA. (Pl. Opp. 4-6). Specifically, Saldana relies on the Third Circuit's decision in *Elassaad v. Independence Air, Inc.*, 613 F.3d 119, 133 (3d Cir. 2010), to argue that neither his negligence claim, nor Georgia's common law standard of care, can be preempted by the ACAA. (Pl. Opp. 4-6).[8] While Saldana is correct that *Elassaad* stands for the proposition that the ACAA does not preempt state tort law standards of care in this context, his argument misunderstands the relevance of *Elassaad* to the holding of *Glatfelter*.

In *Elassaad*, the plaintiff, whose right leg was amputated above the knee and who required crutches to walk, fell and was injured while attempting to descend a narrow staircase from an airplane to the tarmac. 613 F.3d at 122. The district court granted summary judgment in favor of the airline, finding that under the Third Circuit's prior decision in *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 367-68 (3d Cir. 1999), field preemption applied in the aviation context—even during disembarkation—and that

---

[8] Saldana does not identify what standard of care he believes should apply under Georgia law but only that, under *Elassaad*, it cannot be the standard prescribed by the ACAA. (*See generally* Pl. Opp.).

federal law therefore dictated the standard of care. *Id.* at 123-24. After determining that the federal law controlled, the *Elassaad* district court concluded that the ACAA imposed no affirmative duty to offer assistance under the circumstances alleged. *Id.* at 124. On appeal, the Third Circuit reversed, holding that the FAA and ACAA did not preempt Elassaad's claims and clarifying that the analysis of field preemption in *Abdullah* applied only in the context of "in-flight safety," but not disembarkation. *Id.* at 126, 128-31. Thus, as relevant here, the *Elassaad* court concluded that the ACAA did not preempt state law standards of care once the plane has taxied to the gate and come to a stop. *Id.* at 131.

The Third Circuit went on, however, to anticipate and address the situation we confront today. As the *Elassaad* court explained:

> Although we conclude that the ACAA does not provide an applicable, controlling standard of care here, we offer one caveat: the ACAA regulations cited by the District Court are not entirely irrelevant. . . . To the extent that the ACAA regulations set forth an aspect of the duty owed to Elassaad as a disabled person [under state law], it would be appropriate for the jury to consider them.

*Elassaad*, 613 F.3d at 133 n.20 (citation omitted). Thus, although *Elassaad* held that the ACAA does not preempt state law standards of care, it also contemplated that state law may look to federal law, including the ACAA, in establishing an airline's duty and determining the relevant standard of care. *Id.*

The court in *Glatfelter* did just that: It utilized the ACAA to define the standard of care under Georgia law because it determined that the ACAA was the source of the duty owed to the plaintiff. 558 S.E.2d at 796. *Glatfelter* thus drew on the ACAA, but did not

11

hold that the ACAA preempted Georgia law, so Saldana's protestations that *Elassaad* precludes preemption are inapposite. What *Elassaad* did do was presage the *Glatfelter* court's reliance on the ACAA to delineate the scope of the duty and standard of care under Georgia law. And because there is no tension between these cases, *Elassaad* does not compel the Court to disregard *Glatfelter*.

In short, Saldana's Delay Claim against DGS and Delta fails as a matter of law. It is undisputed that the wheelchair showed up within twelve minutes of the plane's arrival at the gate in Atlanta, so there is no disputed material issue of fact. And *Glatfelter* dictates that so short a delay does not violate the relevant standard of care under Georgia law. The Court will therefore grant Defendants' motion for summary judgment as to the Delay Claim.[9]

### 3. The Misinformation Claim

Saldana advances the Misinformation Claim as a second theory of liability against Delta (but not DGS). He contends that even if the twelve-minute delay is not a breach

---

[9] There is also an alternative and independent reason to grant summary judgment on Saldana's Delay Claim. Under *Glatfelter*, Defendants' delay in providing a wheelchair was not the proximate cause of Saldana's injury given Saldana's intervening decision to try to walk to the connecting gate. *See Glatfelter*, 558 S.E.2d at 796-97 (holding decision to walk to connecting gate after wheelchair failed to arrive broke chain of causation); *see also, e.g.*, *De La Cruz Candela v. PrimeFlight Aviation Servs., Inc.*, No. 17 Civ. 1418 (CVR), 2019 WL 11025903, at *9 (D.P.R. Sept. 23, 2019) (same), *aff'd sub nom. De La Cruz-Candela v. JetBlue Airways Corp.*, 829 F. App'x 531 (1st Cir. 2020); *Johnson v. Nw. Airlines, Inc.*, No. 08 Civ. 2272 (VRW), 2010 WL 5564629, at *9 (N.D. Cal. May 5, 2010) (same). In contrast, proximate cause remains a live issue for Plaintiff's Misinformation Claim, where the parties dispute whether information provided by Delta's flight attendant contributed to Saldana's decision to walk to the connecting gate. Delta's motion for summary judgment as to that claim is discussed *infra*.

under Georgia law, Delta is nevertheless liable because its flight attendant was negligent in telling him that he could still make his connecting flight if he walked quickly to a nearby gate when she knew or should have known it was impossible for Saldana to make his connection. (Pl. Opp. 7-8; *see also* FAC ¶¶ 10-11). Delta argues summary judgment is warranted as to this theory because Saldana offers no non-hearsay evidence in support of this argument. (Def. Reply 2). The Court disagrees and will deny summary judgment as to the Misinformation Claim.[10]

The flaw in Delta's argument is that the statement at issue does not appear to be hearsay at all. At this stage, Delta has offered no evidence to refute the testimony of Saldana or his wife that the statement was made by a Delta employee in her official capacity and within the scope of her employment (*see* Howard Dep. 43:7-44:3 (conceding that under Delta policy, the flight attendant should have informed Saldana he had already missed his flight and that he should not attempt to walk to the connecting gate); *see also id.* at 22:5-13 (discussing duty of flight attendants to share information about connections with passengers), 26:14-27:6 (discussing duty of flight attendants to share information about wheelchairs with passengers)). If that testimony is credited, this

---

[10] Delta moves for summary judgment as to the Misinformation Claim for the first time in its reply brief. Trial courts may decline to consider arguments raised for the first time in a reply brief, especially where they are not responding to a new argument raised in the opposition brief. *See In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018) (collecting cases), *aff'd*, 816 F. App'x 637 (3d Cir. 2020); *Charleswell v. Chase Manhattan Bank, N.A.*, 223 F.R.D. 371, 377 (D.V.I. 2004). In the interest of completeness, the Court nevertheless addresses the merits of Delta's motion in this instance. However, going forward, counsel are cautioned to present their arguments fully at the outset or risk waiver thereafter.

is an opposing party's statement—*i.e.*, a statement "made by the party's agent or employee on a matter within the scope of that relationship," which, under the Federal Rules of Evidence, is excluded from the definition of hearsay. Fed. R. Evid. 801(d)(2)(D).

Delta offers no other grounds for granting summary judgment as to the Misinformation Claim, nor does the Court perceive one. Accordingly, Defendants' motion for summary judgment on the Misinformation Claim will be denied.

**B.      Defendants' Motion to Exclude the Testimony of Plaintiff's Expert**

Plaintiff's proffered medical expert, Dr. Shadoff, performed a differential diagnosis—a kind of expert medical opinion that "involve[s] the testing of a falsifiable hypothesis . . . through an attempt to rule out alternative causes," *In re Paoli R.R. Yard PCB Litig.* ("*Paoli II*"), 35 F.3d 717, 758 (3d Cir. 1994)—to form his opinion that Saldana suffered a heart attack as a result of hurrying to catch the connecting flight. (*See* Shadoff Report). Defendants now move to exclude Dr. Shadoff's testimony on the grounds that his report is unreliable. (*See* MIL Br. 1). For the reasons discussed below, the Court concludes that Dr. Shadoff's testimony is sufficiently reliable to survive Defendants' motion to exclude.

**1.      Applicable Law**

The introduction of expert opinion testimony is governed by Rule 702 of the Federal Rules of Evidence. Under that rule, a witness qualified as an expert by knowledge, skill, experience, training, or education may provide opinion testimony if: (i) the testimony will assist the trier of fact; (ii) the testimony is based upon sufficient

14

facts or data; (iii) the testimony is the product of reliable principles and methods; and (iv) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Unlike a lay witness, an expert witness is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

To establish reliability, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" and furthermore, "the expert must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). Although differential diagnosis is a respected methodology for opining on medical causation, *see, e.g.*, *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999), it must be "properly performed" to be reliable, *Lee v. Kmart Corp.*, No. 1:14 Civ. 79 (WAL), 2017 WL 3083412, at *5 (D.V.I. July 18, 2017) (quoting *Feit v. Great W. Life & Annuity Ins. Co.*, 271 F. App'x 246, 254 (3d Cir. 2008) (not precedential)). Proper performance involves two steps: The expert must: (i) "[r]ule in all possible causes of [injury]"; and (ii) "[r]ule out causes through a process of elimination whereby the last remaining potential cause is deemed the most likely cause of [injury]." *Id.* at *5 (quoting *Feit*, 271 F. App'x at 254 (internal quotation marks omitted) (second and fourth alterations in *Lee*)).

Where, as here, the expert testifies as to causation, he or she must "offer . . . an explanation if the defendants point[] to some likely cause of the plaintiff's [injury] other than the defendants' actions." *Paoli II*, 35 F.3d at 762. If, instead, "a defendant points to a plausible alternative cause and the doctor offers *no* explanation for why he or she has

15

concluded that was not the sole cause," *Heller*, 167 F.3d at 156 (quoting *Paoli II*, 35 F.3d at 759 n.27 (internal quotation marks omitted)), his methodology will be deemed unreliable. But if the plaintiff's expert adequately addresses a defendant's proffered alternative causes, then those "suggested alternative causes . . . affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Id.* at 156-57 (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997)).

  2.  **Analysis**

Defendants argue that Dr. Shadoff's testimony is insufficiently reliable because he failed to consider and rule out all potential alternative explanations for Saldana's heart attack. (*See* MIL Br. 4-6). In particular, Defendants point to a doctor's note from Saldana's visit to the emergency room in Atlanta stating that Saldana reported his chest pain "began while on the flight from the Virgin Islands [to Atlanta]," and "began 6-12 hours ago." (MIL Reply, Ex. B). Saldana responds that Dr. Shadoff *did* consider the doctor's note in question, but concluded—based on the totality of the evidence in Saldana's medical records—that Saldana could not have been experiencing symptoms while on his flight from the Virgin Islands to Atlanta, six to twelve hours before presenting at the hospital in Atlanta. (MIL Opp. 4-5). Saldana also submits a supplemental declaration from Dr. Shadoff supporting that argument. (*See* MIL Opp., Ex. 2 ("Shadoff Decl.")).

Considering Dr. Shadoff's expert report, supplemental declaration, and deposition testimony, the Court concludes that Dr. Shadoff addresses alternate causes sufficiently to survive Defendants' motion. According to his declaration, Dr. Shadoff considered the

Case: 1:19-cv-00027-CAK-GWC Document #: 94 Filed: 10/08/21 Page 16 of 19

concluded that was not the sole cause," *Heller*, 167 F.3d at 156 (quoting *Paoli II*, 35 F.3d at 759 n.27 (internal quotation marks omitted)), his methodology will be deemed unreliable. But if the plaintiff's expert adequately addresses a defendant's proffered alternative causes, then those "suggested alternative causes . . . affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Id.* at 156-57 (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997)).

2. **Analysis**

Defendants argue that Dr. Shadoff's testimony is insufficiently reliable because he failed to consider and rule out all potential alternative explanations for Saldana's heart attack. (*See* MIL Br. 4-6). In particular, Defendants point to a doctor's note from Saldana's visit to the emergency room in Atlanta stating that Saldana reported his chest pain "began while on the flight from the Virgin Islands [to Atlanta]," and "began 6-12 hours ago." (MIL Reply, Ex. B). Saldana responds that Dr. Shadoff *did* consider the doctor's note in question, but concluded—based on the totality of the evidence in Saldana's medical records—that Saldana could not have been experiencing symptoms while on his flight from the Virgin Islands to Atlanta, six to twelve hours before presenting at the hospital in Atlanta. (MIL Opp. 4-5). Saldana also submits a supplemental declaration from Dr. Shadoff supporting that argument. (*See* MIL Opp., Ex. 2 ("Shadoff Decl.")).

Considering Dr. Shadoff's expert report, supplemental declaration, and deposition testimony, the Court concludes that Dr. Shadoff addresses alternate causes sufficiently to survive Defendants' motion. According to his declaration, Dr. Shadoff considered the

doctor's note in question but determined that the totality of Saldana's medical records supported his decision to discount its importance. (*See generally* Shadoff Decl.). For example, Dr. Shadoff points to Saldana's troponin levels recorded in a blood test taken at the emergency room in Atlanta as evidence that Saldana's heart attack could not have occurred prior to rushing to the gate of his connecting flight, and conflicting evidence in other doctors' notes from Saldana's hospitalization in Atlanta. (*Id.* ¶¶ 4-7). The record thus belies Defendants' contention that Dr. Shadoff failed to consider the doctor's note at all, and any argument that he erred in discounting it goes to weight, not admissibility. *See Heller*, 167 F.3d at 156-57; *accord Paoli II*, 35 F.3d at 744.

Perhaps recognizing as much, Defendants switch tactics and argue that Dr. Shadoff's testimony should still be excluded because the troponin-based explanation is a "new opinion" and admitting it at trial would violate two procedural rules requiring that expert opinions at trial be limited to the opinions in the witness's deposition and report. (MIL Reply 3-4). One provides that a party must disclose "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B).[11] The other states in relevant part that "[e]xperts shall not be permitted to testify on matters beyond the scope of the subjects and the opinions

---

[11] Although not cited in Defendants' brief, Fed. R. Civ. P. 26(a)(2)(D)(i) requires such information to be disclosed at least 90 days before trial. Here, a trial date has not yet been set and, even accepting Defendants' contention that the troponin arguments are new, the relevant information was disclosed in December 2020—more than ninety days ago.

expressed in the referenced written report (or, if elicited on cross-examination, at a deposition)." Local Rule 26.3(a).

The problem with this argument is that Dr. Shadoff provided his troponin-level explanation at least at his deposition. Specifically, Dr. Shadoff described how he concluded—based on Saldana's troponin levels—that the heart attack was triggered by Saldana's hurried transfer between gates, responding to a line of questioning from defense counsel on the very issue of causation raised in the instant motion. (*See, e.g.*, Shadoff Dep. 50:2-51:9). And because Defendants cross-examined him on that subject, this is not a situation where a plaintiff seeks to exploit an "unfair surprise at trial" by "lying in wait to express new opinions at the last minute." (MIL Reply 4 (quoting *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 28 (D.D.C. 2007) (internal quotation marks omitted))).

In the absence of any basis for finding Dr. Shadoff's expert opinion inadmissible, the Court denies Defendants' motion *in limine* to exclude his expert testimony.

## CONCLUSION

For the reasons discussed above, the Court will grant summary judgment to DGS in full and will grant summary judgment to Delta as to the Delay Claim, but not the Misinformation Claim. Defendants' motion *in limine* will be denied. An appropriate Order will follow.

SO ORDERED.

Dated: October 8, 2021

_____
CHERYL ANN KRAUSE
United States Circuit Judge